PER CURIAM.
Kevin Don Foster appeals an order of the circuit court denying his motion filed under Florida Rule of Criminal Procedure 3.850 to vacate the judgment of conviction of first-degree murder and sentence of death. Because the order concerns post-conviction relief from a capital conviction for which a sentence of death was imposed, this Court has jurisdiction under article V, section 3(b)(1), Florida Constitution. For the reasons that follow, we affirm the circuit court’s order denying postconviction relief.
FACTS AND BACKGROUND
Kevin Foster was convicted of the April 1996 first-degree murder of Mark Schwebes, the Riverdale High School band teacher, in Fort Myers, Florida. Foster, eighteen years of age, did not attend Riv- *48 erdale High School at the time. However, he was the leader of a group that called itself “Lords of Chaos,” which did include students from that school. In furtherance of a mission to carry out widespread vandalism in the community, Foster and five other members of the group decided to vandalize Riverdale High School and set its auditorium on fire on the night of April 30, 1996. That plan was interrupted, however, when Schwebes drove up to the auditorium and confronted two members of the group — Christopher Black and Thomas Torrone — about the vandalism. Foster was not confronted because he had run away. Later, after Black told Foster that Schwebes was planning to contact the school resource officer the next day, Foster agreed with Black that Schwebes “must die.” Foster, along with Black and Lords of Chaos members Peter Magnotti and Derek Shields, went to Foster’s home where Foster obtained a shotgun which he loaded with # 1 buckshot, a map to locate Schwebes’ home, gloves, and ski masks. After calling Schwebes’ telephone number to confirm he was home, Foster, Black, Magnotti, and Shields went to Schwebes’ home. On the way to Schwebes’ home they stopped and placed a stolen license tag on Shields’ vehicle. When Schwebes answered their knock on the door, Foster shot him in the face with the shotgun that he brought with him. Foster then shot Schwebes a second time in the pelvis.
After a jury trial at which the members of the Lords of Chaos who had participated in the murder and the conspiracy testified against Foster in exchange for plea deals, Foster was convicted of first-degree murder. The penalty phase resulted in a jury recommendation of death by a nine-to-three vote. After finding two aggravating factors[1] and rejecting or attaching little to no weight to the twenty-three miti-gators offered by Foster,[2] the trial court sentenced Foster to death. Foster appealed and this Court affirmed in Foster v. State, 778 So.2d 906 (Fla.2000).
Foster raised seven issues on direct appeal: (1) his numerous pretrial change of venue motions were improperly denied; (2) the court erred in permitting the State to elicit hearsay testimony of several witnesses; (3) comments of the trial judge during the guilt phase demonstrated that the court had prejudged the case; (4) the avoid arrest aggravator should not have been submitted to the jury in the penalty phase; (5) the trial court erred in admitting charging information concerning other crimes at the Spencer hearing; (6) the trial court failed to properly consider the mitigating circumstances and its findings are unclear; and (7) the sentence was disproportionate in comparison to other cases. See Foster, 778 So.2d at 912 n. 8.
As to the motions for change of venue, this Court held that although there was a “great deal of publicity about the case in the local community,” the trial court prop *49 erly denied the motions for change of venue. Id. at 913. We concluded that “the media coverage as a whole did not reach such an inflammatory level to have irreversibly infected the community so as to preclude an attempt to secure an impartial jury.” Id. We also noted that the jurors who were impaneled in Foster’s case did not indicate they had been exposed to the “more egregious” examples of publicity cited by Foster. Id. at 914.
Foster raised several hearsay claims on appeal. As to the first hearsay claim, Foster contended that the trial court erred in admitting double hearsay contained in the statements of Magnotti, Shields, and another member of the group, Bradley Young, that Black told them Schwebes had threatened to go to the Riverdale High School campus police. Id. at 915. We held that this testimony was properly admitted to establish knowledge and motive, not the truth of the matter asserted. Foster, 778 So.2d at 915. Foster also contended that the testimony of Young, Magnotti, and Shields that Black said Schwebes “had to die” was inadmissible hearsay. Id. We held this testimony was not inadmissible hearsay because it was not admitted to prove Schwebes had to die, but was admitted to establish the conspiracy and Foster’s part in it, pursuant to the hearsay exception in section 90.803(18)(e), Florida Statutes (1997). Id. For this same reason, other testimony about planning and carrying out the killing, such as that relating to finding Schwebes’ address, replacing the birdshot in the shotgun with more lethal ammunition, and subsequent conversations about the murder, was also properly admitted. Id.
Foster also challenged the testimony of David Adkins, whom Schwebes had dinner with shortly after the confrontation at the auditorium. Adkins testified that Schwebes told him he planned to report the group. Although we held this testimony to be inadmissible hearsay, we concluded it was harmless. Id. at 916. In the next hearsay claim, Foster challenged the redirect testimony of Shields about a prior consistent taped statement he gave to law enforcement immediately after his arrest and before any plea negotiations. We held that the testimony was not improper hearsay because it was offered to rebut an express or implied charge made in cross-examination of Shields that his testimony resulted from the improper influence of his plea deal. Id. The last hearsay claim on direct appeal concerned the testimony of Peter Magnotti’s mother, who related a telephone conversation she had with Ruby Foster, Foster’s mother, in which Ms. Foster attempted to persuade Ms. Magnotti to help create an alibi for Foster. See id. at 917. We held that this testimony was improper hearsay but concluded that the error was harmless. Id. Foster’s other claims on direct appeal were found to be without merit.
Because the postconviction claims for which Foster was given an evidentiary hearing concern the penalty phase of trial, we briefly review that portion of the trial proceedings next. A discussion of the defense evidence in the penalty phase of the trial is set forth in this Court’s direct appeal opinion, in pertinent part, as follows:
The defense presented numerous witnesses who presented a picture of Foster as a kind and caring person. May Ann Robinson, Foster’s neighbor, testified that he once helped her start her car and offered to let her borrow a lawn mower. Robert Moore, another neighbor, testified that Foster was well-mannered and a hard worker. Shirley Boy-ette found Foster to be very caring, intelligent, and well-mannered. Robert Fike, Foster’s supervisor at a carpentry *50 shop, and James Voorhees, his co-worker, found him to be a reliable worker. Voorhees also testified that Foster was very supportive to Voorhees’ son who suffered from and eventually died of leukemia. Similarly, Raymond and Patricia Williams testified that Foster was very nice to their son who suffered from spi-na bifida. Peter Albert, who is confined to a wheelchair, related how Foster had helped Albert’s mother care for him after his wife died. Foster also helped Albert in numerous other ways, including preparing his meals, fixing things around the house, and helping Albert in and out of his swimming pool.
There was additional testimony that described Foster’s involvement with foreign exchange students. Foster was also known to have given positive advice to young children. Foster’s sister, Kelly Foster, testified to how he obtained his GED after dropping out of high school and that he obtained a certificate for the completion of an “auto cad” program at a vocational-technical school. Finally, Foster’s mother testified that he was born prematurely and suffered from allergies, and that Foster’s father abandoned him a month after birth. On cross-examination, many of the witnesses who testified to Foster’s kindness admitted that they had not been in contact with him for a number of years.
Foster, 778 So.2d at 911-12. Foster’s mother also presented a lengthy photographic slide show created by her and the defense team containing photographs of Foster during his childhood and with family and friends. The photographs depicted Foster’s childhood as normal and one in which he had the advantages of a loving family, vacations in America and abroad, and many friends.
After the penalty phase of trial, a Spencer [3] hearing was held at which the victim’s sister testified to victim impact evidence. Over objection, the State also submitted a copy of the charges brought against Foster in a separate case — charging Foster with twenty-seven crimes allegedly committed by Foster and the Lords of Chaos — as evidence going toward proof of the avoid arrest aggravator. On direct appeal, we concluded that the evidence of those other unproven charges, which were not convictions of a capital or other violent felony, should not have been considered. See Foster, 778 So.2d at 919. However, the error was harmless because the improper evidence was submitted only to the judge at the Spencer hearing, there was already evidence in the record of those other crimes, and there was no indication that the trial court relied on the improper information in sentencing Foster. See id. The defense did not present any additional mitigating evidence at the Spencer hearing and Foster did not testify, although he submitted an affidavit in which he professed his innocence, complained of the media’s treatment of him and his family, and further complimented his defense counsel for doing a “commendable job.”
On June 25,1998, the trial court entered the sentencing order in which Foster was sentenced to death. The court expressly rejected Foster’s age of eighteen as a statutory mitigator based on the conclusion that Foster was not young emotionally or mentally, Foster had been out of school for two years, had obtained a GED, had taken other courses “in preparation for life as an adult,” and had traveled abroad. On direct appeal, we held that the trial court correctly evaluated and rejected the age mitigator, and we noted that the evidence showed Foster was the leader of the *51 group, had above-average intelligence, and “produced no evidence of any emotional or mental irregularities, chronic or otherwise, despite the availability of two mental experts.” Foster, 778 So.2d at 921.
POSTCONVICTION PROCEEDINGS
Foster filed his initial postconviction motion under Florida Rule of Criminal Procedure 3.850 on September 27, 2001,[4] and a corrected amended motion on May 27, 2010.[5] A Huff hearing was held on October 22, 2010.[6] After the Huff hearing, the postconviction court issued an order scheduling an evidentiary hearing only on Foster’s claims that his trial counsel rendered ineffective assistance in the penalty phase of trial by abdicating the responsibility for developing mitigation to Foster’s mother, by the defense team being impaired and disorganized, by failing to discover and present mental mitigation and present testimony of a neuropsychologist, and by failing to sufficiently challenge the evidence of aggravating circumstances.
At the evidentiary hearing held April 26-29, 2011, Foster presented numerous witnesses, although his lead defense counsel at trial was not available to testify because he died before the matter was heard. From the defense team, Foster presented the testimony of defense co-counsel Marquin Rinard, defense investigator Roberta Harsh, and paralegal James Wootton. In addition, Foster presented the testimony of his half-sister, Kelly Foster; his aunt, Linda Albritton; his cousin, Candy Albritton-Green; his grandfather, Jack Bates, Sr.; his biological father, Jack Bates, Jr.; his mother’s first husband, Ronald Newberry; clinical psychologist *52 Dr. Ernest Bordini; clinical psychologist Dr. Faye Sultan; neuropsychologist Dr. Ruben Gur; and neurologist Dr. Thomas Hyde. The State presented the testimony of psychiatrist and neurologist Dr. Leon Proekup, psychiatrist Dr. Robert Wald, and clinical psychologist Dr. Michael Ga-mache.
After hearing the evidence, Judge Edward Volz, Jr., denied Foster’s motion for postconviction relief in a comprehensive order which Foster now appeals. As explained more fully below, we find no merit in Foster’s claims and affirm the order denying postconviction relief.
ANALYSIS
Standard of Review
To obtain relief on claims of ineffective assistance of counsel, the defendant “must show that his attorney’s performance was deficient and that the deficient performance prejudiced his defense.” Sochor v. State, 883 So.2d 766, 771 (Fla.2004) (citing Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). In order to establish deficient performance, the defendant must show that his attorney’s representation fell below an objective standard of reasonableness by committing errors “so serious that counsel was not functioning as the ‘counsel’ guaranteed ... by the Sixth Amendment.” Strickland, 466 U.S. at 687, 104 S.Ct. 2052. As to proof of prejudice where, as here, the defendant claims that counsel provided ineffective assistance in the penalty phase, “the question is whether there is a reasonable probability that, absent the errors, the sentencer ... would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.” Strickland, 466 U.S. at 695, 104 S.Ct. 2052. “We do not require a defendant to show ‘that counsel’s deficient conduct more likely than not altered the outcome’ of his penalty proceeding, but rather that he establish ‘a probability sufficient to undermine confidence in [that] outcome.’ ” Porter v. McCollum, 558 U.S. 30, 44, 130 S.Ct. 447, 175 L.Ed.2d 398 (2009) (quoting Strickland, 466 U.S. at 693-94, 104 S.Ct. 2052). We defer to the postconviction court’s factual findings as long as they are supported by competent, substantial evidence but review de novo the circuit court’s legal conclusions. See Johnson v. State, 104 So.3d 1010, 1022 (Fla.2012); Sochor, 883 So.2d at 771-72. “[W]e apply a mixed standard of review because both the performance and the prejudice prongs of the Strickland test present mixed questions of law and fact.” Sochor, 883 So.2d at 771. With these standards in mind, we turn to the claims for which an evidentiary hearing was granted.
I. CLAIMS FOR WHICH AN EVIDENTIARY HEARING WAS HELD
A. Claim that Defense Counsel Abdicated Responsibility for Mitigation
We turn first to Foster’s claim that trial counsel abdicated responsibility for the investigation and presentation of mitigation to Foster’s mother. Foster argues that “the entire penalty phase was presented as Ms. Foster’s version of Kevin’s life” and that “[c]ounsel did not question whether her version was, in fact, true.” At the evidentiary hearing, Foster presented Roberta Harsh, defense investigator, who testified that the defense team “pulled out all the stops” and used everything at their disposal in representing Foster. Paralegal James Wootton testified that even before the guilt phase began, the defense team knew it had to gear up for the penalty phase due to the overwhelming *53 amount of evidence of guilt.[7] Wootton testified that Foster had been evaluated by psychiatrist Dr. Wald early in the case.
Dr. Wald, along with neuropsychologist Dr. Masterson who was to work at Dr. Wald’s direction, was appointed almost immediately after Foster’s arrest. The order of appointment indicated that the experts were to assist counsel in preparing the defense and to make such examinations of Foster and such reports to defense counsel as defense counsel may direct. Wootton testified that, although there was discussion amongst the defense team about whether Foster was mentally ill or abused as a child, the answer was always that he was not. Wootton also testified that the input from the family indicated that there was nothing wrong with Foster and that he was a wholesome, healthy young man who was being framed by his codefen-dants. Wootton explained that although Foster’s mother voiced her opinions about the defense, made suggestions concerning witnesses, and attended about half of the team meetings on the case, it was Foster himself along with lead counsel Robert Jacobs who made the decision about the theory of his defense, which was to present Foster as a good child who deserved to be saved.[8]
Foster also presented the testimony of defense co-counsel Marquin Rinard, an assistant public defender experienced in capital cases. Rinard explained that a mitigation specialist was not retained, but that the defense team compiled Foster’s school records and many of his medical records. Rinard saw no written report from Dr. Wald, who later explained at the evidentia-ry hearing that he did not believe he was asked to prepare a written report. Dr. Wald’s patient records were unavailable because they had been transferred to a doctor who purchased his practice in 2001 and were then lost. However, based on billing records Dr. Wald maintained, he testified that he did do an evaluation of Foster and, based on his normal practices, that evaluation would have attempted to discover any indication of mental or behavioral disorders. In the mental status examination, Dr. Wald testified, he would have looked for delusion patterns, indications of auditory hallucinations, paranoia, cognitive function, memory, concentration, and issues of judgment. Dr. Wald explained that his normal practice would also have been to look for indications of bipolar disorder, manic characteristics, depression, and suicidal ideations.
Foster’s mother provided alibi information for the guilt phase and provided a long list of possible witnesses for the penalty phase but, Rinard testified, it was Jacobs and Foster who decided on the theory of the defense. Rinard said he felt sure he and Jacobs discussed Foster’s age, emotional level, and progress in school. According to Rinard’s testimony, none of the witnesses that the defense team contacted provided any information causing them to suspect that Foster had mental health problems, and neither of Foster’s defense counsel noted any indication of mental health problems or depression in their encounters with Foster. In depositions taken by the State of seven of Foster’s relatives in Amarillo, Texas, which were attended by a public defender on Foster’s behalf, those relatives reported *54 generally that Foster had a normal childhood with a loving mother and extended family. None testified to any abuse of Foster or to any abusive environment in his home. Rinard testified that Jacobs took primary responsibility for both phases of the trial and that, based on the information they had, defense counsel knew they must attempt to humanize Foster at the penalty phase of trial and present him in the best light possible.
In support of the effort to humanize Foster for the penalty phase jury, Rinard testified that the defense team compiled a great deal of information about Foster helping others and being a good person, which they thought was necessary to overcome the negative guilt phase evidence about Foster. The defense discovered incidences in which Foster assisted disabled people in their homes and did yard work for them, and found that Foster was closely involved with people who were terminally ill, all of which was favorable information for the jury. At the penalty phase of trial, the defense presented twenty-four witnesses who were members of Foster’s family, friends of the family, childhood friends of Foster, his former employer, and neighbors. Their testimony showed that Foster was a normal and good child loved by family and friends, as well as a helpful, polite, and compassionate teenager.
At the postconviction evidentiary hearing, Foster’s older half-sister, Kelly Foster, testified that she assumed lead counsel Jacobs decided what evidence was to be presented in the penalty phase. As to Foster’s childhood, Kelly testified that her first stepfather, Kevin Foster’s biological father, treated her roughly, but Foster’s mother divorced him and the family moved soon after Foster was born.[9] She testified that the next stepfather, Brian Burns, was the father figure to her and Foster for the rest of their childhood. Although he had anger issues and had been “physical” with their mother, Burns had been a good father and remained close to the family even after the divorce. After divorcing Burns, Foster’s mother married again, to truck driver John Foster, and spent a lot of time on the road with him, leaving the children with relatives. John Foster later stopped driving a truck and opened a pawn shop. Foster’s mother divorced him after she and he had a few “scuffles.” Kelly related that other relatives had mental problems. Other family members testified at the evi-dentiary hearing that there was mental illness in the family. They also related that Foster was a hyperactive child who was clumsy and often had accidents. None of the negative aspects of the family background evidence was reported to the defense team at the time of trial.
Based on the evidence presented, the circuit court denied relief on this claim, finding that defense counsel did not abdicate their responsibility for mitigation to Foster’s mother. The court concluded that Foster and lead counsel Jacobs made the decisions regarding mitigation strategy for the case and that Ms. Foster merely provided contact information for possible penalty phase witnesses, suggestions of inconsistencies in the evidence, and questions that she believed should be asked of witnesses. The favorable, humanizing mitigation presented in the penalty phase was the only mitigation that Foster and his counsel determined should be presented. We have recognized that “[cjompetent defendants who are represented by counsel maintain the right to make choices in respect to their attorneys’ handling of their cases” which “includes the right to either waive presentation of mitigation evidence *55 or to choose what mitigation evidence is introduced by counsel.” Hojan v. State, 3 So.3d 1204, 1211 (Fla.2009).
The court further found that Foster failed to meet his burden to establish the prejudice prong of Strickland. Competent, substantial evidence supports the circuit court’s findings and we affirm denial of relief on this claim.
B. Claim that the Defense Team was Impaired and Disorganized
Foster next contends that his defense counsel provided ineffective assistance because the defense team was disorganized, confused, and impaired. This claim was also included within the purview of the evidentiary hearing. The circuit court found, after hearing the testimony, that the allegations were unproven. In denying relief, the court noted testimony that Jacobs, who had Parkinson’s disease, was not adversely affected in his representation of Foster by his Parkinson’s tremors. Wootton denied seeing any confusion on Jacobs’ part and testified that Jacobs could think on his feet and do what needed to be done. He said he was around Jacobs enough to be able to say that Jacobs was not affected by the disease in any way that would have hindered his ability to defend Foster. Defense co-counsel Rinard testified that he never saw Jacobs trembling or confused. The postconviction court stated, “The Court finds their testimony that Mr. Jacobs was not trembling or confused to be more credible than those of other witnesses who were not in close proximity to Mr. Jacobs during trial, or who have a motive for bias against Mr. Jacobs and in favor of Defendant’s motion.”
In attempting to prove that the defense team was confused, impaired, and disorganized, Foster relies primarily on a book about the murder and trial titled Someone Has to Die Tonight[10] by Jim Greenhill which, Foster contends, reported that the defense appeared “confused.” Foster also alleges that according to the Greenhill book, jurors who were close to Jacobs throughout trial noticed his tremors and confusion and found it “off-putting.” However, Foster did not present testimony at the evidentiary hearing in support of these specific allegations. Foster did present the testimony of Jack Bates, Jr., Foster’s biological father, who testified at the evi-dentiary hearing that Jacobs “would sometimes get I think frustrated, or somewhat confused.” The State’s objection that the statement called for speculation was sustained. Even if that testimony had been admitted, it would not have proven that the defense team was disorganized, confused, or impaired.
Foster also argues that paralegal Woot-ton characterized the defense as “disorganized.” Wootton actually testified that when he first started his job with the public defender, the Foster documents were stored in a box and were “more so disorganized than organized.” He explained that his job was “to put it all together to prepare — to put it into this [trial] software program.” Thus, Woot-ton’s comment about disorganization did not refer to the defense team generally, just to the documents he was given to organize and computerize for trial preparation — which he testified that he did.[11] *56 The circuit court concluded that Foster failed to meet his burden that the defense team was in any way impaired during trial. We agree.
We reiterated in Clark v. State, 35 So.3d 880 (Fla.2010), that “[a]s long as the trial court’s findings are supported by competent substantial evidence, this Court will not ‘substitute its judgment for that of the trial court on questions of fact, likewise of the credibility of the witnesses as well as the weight to be given the evidence by the trial court.’ ” Id. at 886 (quoting McLin v. State, 827 So.2d 948, 954 n. 4 (Fla.2002)); see also Bell v. State, 965 So.2d 48, 63 (Fla.2007) (“Questions of credibility are left to the determination of the circuit court, and provided there is competent, substantial evidence to support those credibility assessments, we will defer to that court’s decision.” (citing Archer v. State, 934 So.2d 1187, 1196 (Fla.2006) (“This Court is highly deferential to a trial court’s judgment on the issue of credibility.”))). The postconviction court had before it competent, substantial evidence refuting Foster’s claim that the defense team was disorganized, confused, or impaired. We will not second-guess the circuit court on its findings based on this evidence or on the court’s credibility determinations. For these reasons, the posteonvietion court did not err in denying Foster’s claim and we affirm.
C. Claim of Deficient Investigation and Presentation
of Foster’s Background and Mental Mitigation
In Foster’s next claim for which an evidentiary hearing was held, he contends that trial counsel was deficient in the investigation and presentation of Foster’s mental health and background mitigation, and that counsel should have sought neu-ropsychological testing of Foster. The circuit court denied the claims, concluding that trial counsel cannot be found deficient in failing to present negative mitigating information about Foster when none was provided to counsel by Foster, his family, or his friends and where counsel had no reason to believe such negative information existed. The court cited denial of any mental health issues by Foster and his family, and concluded that the “subtle” or “soft” findings of mental issues by Foster’s current experts do not cause the court to find any clear indication existed that Foster suffered from organic brain damage or other mental impairments such that trial counsel was obligated to seek neuropsy-chological testing. The court further found that the evidence and testimony presented at the hearing did not substantiate claims that Foster suffered a history of concussions, which would have been a red flag for possible brain damage or that he had an abusive or troubled childhood. The court found that defense counsel was never advised of any mitigation arising from the conditions of Foster’s childhood, and disagreed that the testimony revealed “significant mitigation leads” which defense counsel should have followed. Thus, the circuit court concluded that trial counsel made a reasonable tactical decision not to pursue further mental health investigation after receiving an initial diagnosis that there were no mental health issues and after receiving no indication of mental issues or other childhood mitigation from Foster and his family. Accordingly, the court held that, under the circumstances, it was not unreasonable for counsel to rely on an attempt to humanize Foster for the jury and present only favorable mitigation.
*57 As to prejudice, the circuit court concluded that even if all the information that Foster claims should have been elicited had been presented in the penalty phase, there would be no reasonable probability that the mitigation would have outweighed the aggravation presented at trial. The court found that the expert testimony concerning mental impairments and the testimony concerning Foster’s childhood and alcohol abuse, dementia, and mental illness in extended family members would not have outweighed the aggravating circumstances in this ease. We agree and conclude that all the court’s findings are supported by competent, substantial evidence.
Defense co-counsel Rinard testified that in 1996 a public defender investigator interviewed Foster and asked him about any suicide attempts, involuntary commitment, chronic drug or alcohol abuse, seizures, retardation, or serious head injuries. The record shows Foster’s negative responses to these inquiries. The interview notes also indicate that Foster did not appear odd-acting, inattentive, hostile, or argumentative. The circuit court noted that neither Wootton nor Rinard saw any indications of depression or mental impairment during their interactions with Foster. Wootton testified that the defense team discussed whether any additional experts needed to be retained, but based on the examination that was done of Foster early in the case and based on everything else the defense team had before it, the decision was made that no further experts needed to be retained to look into mental health issues, abuse, neglect, or any other similar mitigation because there was nothing to support it. Although Foster’s half-sister, Kelly, testified at the evidentiary hearing that their childhood was tumultuous, with a series of stepfathers who on occasion were angry and sometimes rough with their mother, nothing in her testimony suggested that Foster had an abusive childhood. She also described Foster as clumsy and said she had seen him depressed. Other family members testified at the hearing that Foster and his sister were often left with relatives and that their home life was unstructured. However, none of this information was provided to defense counsel at the time of trial. Rinard testified that the only information received from family members — many of whom testified at the penalty phase of trial — described Foster and his childhood in favorable terms, and that Foster and his family were resistant to discussing any other course of mitigation.
In an effort to establish that neuropsy-chological testing was indicated, Foster presented several experts at the evidentia-ry hearing. Dr. Ernest Bordini testified that he administered a number of tests to Foster, including the Halstead-Reitan Battery of tests, the Wisconsin Card Sort tests, the Stroop Interference Procedure test, the Luria Battery of tests, and the Victor Symptom Validity test for malingering. Dr. Bordini concluded that Foster has a high verbal IQ score of 137 but a lower performance IQ score of 105, which Dr. Bordini opined was indicative of right hemisphere brain weakness. Dr. Bordini also noted that Foster’s birth records showed he suffered respiratory distress at birth and was hospitalized for about a week. He opined that this respiratory distress indicated that Foster was at high risk of having neurological issues. He characterized Foster’s current reports of past head injuries as concussions, although Dr. Bordini did not see medical records confirming concussions suffered by Foster. Dr. Bordini also diagnosed Foster with depression occurring after incarceration based on Foster’s current reports of depression to Dr. Bordini. Finally, Dr. Bor-dini diagnosed Foster with possible nonverbal learning disorder, possible bipolar *58 disorder, and antisocial personality disorder. However, the State’s experts, Dr. Leon Prockup and Dr. Michael Gamache, disagreed that the records showing the respiratory distress at birth were indicative of possible brain damage. Dr. Ga-mache testified that the hospital records showed Foster suffered common respiratory distress often seen in newborns when they lack a “surfactant” on their lungs that enables ease of breathing immediately after birth. He explained that this condition is not an indication of lack of oxygen (hypoxia) or complete lack of oxygen (anoxia). Dr. Gamache also disagreed that the variance between Foster’s high verbal IQ score and his lower performance IQ score were indicative of brain damage. He testified that both scores were above average and not indicative of impairment. The circuit court found the testimony of Drs. Prockup and Gamache on these issues to be more credible.
Dr. Ruben Gur testified that he used the raw data from Dr. Bordini’s neurological testing to produce a “brain map” that identified areas of Foster’s brain which Dr. Gur said showed frontal lobe impairment that would affect Foster’s ability to plan, to consider long-term goals, and to make reasoned decisions regarding long-term consequences. However, Dr. Prock-up testified that in his opinion the brain mapping methodology is not accurate or valid and that the algorithm on which the methodology is based was created with insufficient data. Dr. Prockup discovered no publications or articles on this type of brain mapping methodology since 1990. Dr. Gamache testified that, to his knowledge, statistical brain maps such as this are not frequently used by neurologists. He opined that the mapping methodology used by Dr. Gur was not generally accepted in the field of neuropsychology.[12]
Foster also presented Dr. Thomas Hyde, who testified that Foster’s facial asymmetry and asymmetrical leg length were “subtle” findings referable to brain damage even though Foster received a perfect score on the “mini” mental state test Dr. Hyde performed on him. Dr. Hyde’s conclusion of possible brain damage was also based on the variance between Foster’s verbal IQ score and his performance IQ score. Dr. Hyde diagnosed Foster with significant mood disorder, depression, hypomania, and mania based “primarily on self reports.” The circuit court concluded that Dr. Hyde’s “subtle” findings were speculative at best.
Dr. Sultan, who first evaluated Foster in 2002, diagnosed Foster with possible brain injury due to his respiratory distress at birth. In addition, she opined that Foster was significantly depressed, suicidal, and bipolar. To support her conclusion that Foster was suicidal, Dr. Sultan cited a gunshot wound Foster suffered at age sixteen. Dr. Sultan concluded that it was a suicide attempt primarily based on Foster’s insistence that it was accidental while he was cleaning a gun. Similarly, she described Foster’s act of jumping off a bridge shortly after release from the hospital as a possible suicide attempt, even though Foster did not describe it as a suicide attempt. The hospital records for treatment of Foster’s gunshot wound indicated the wound was accidental and that upon specific inquiry of Foster and his mother by hospital staff about suicidal thoughts or depression, the response was that there were none. Nothing provided in the evidentiary hearing refuted the fact that the gunshot wound was accidental. *59 Nor was any evidence presented to substantiate speculation that Foster’s jump off a bridge soon after he was released from the hospital after his gunshot wound was a suicide attempt. The circuit court found that it “could have been merely a teenage stunt.” Dr. Sultan also concluded Foster was depressed based on his reports to her that currently and in his teens he had episodes of depression. However, these self-reports of depression which Foster provided his current experts were not provided to trial counsel, who had no indication that Foster had suffered any episodes of depression. Dr. Gamache also testified that the data relied on by Dr. Sultan did not support her diagnosis that Foster suffered from bipolar disorder.
As to whether defense counsel should have suspected Foster had brain damage or mental impairment based on earlier head injuries, Rinard testified that there were no records of Foster having received concussions. Foster presented no evidence at the hearing to substantiate his experts’ speculation that he had suffered concussions as a child. Even Dr. Bordini, who based much of his diagnosis on the assumption that Foster had a history of concussions, conceded on cross-examination that he saw no medical records supporting a history of concussions.
Moreover, Dr. Wald evaluated Foster prior to trial and testified that his standard practice in such examination would be to look for any signs of mental illness or impairments. Neither Rinard nor Woot-ton detected any obvious mental problems in their interactions with Foster. Nothing in the medical or school records that trial counsel reviewed indicated that further mental evaluation was necessary. Foster and his family members denied there were any mental problems, depression, or suicidal ideations.
In concluding that trial counsel had no basis to suspect that Foster might have mental issues that required investigation, the circuit court cited the testimony at the evidentiary hearing by Ronald Newberry, who also testified at the penalty phase of trial, that Foster was “hyper” but was “just a normal, regular kid.” The circuit court also noted that certain of Foster’s extended family members testified at the evidentiary hearing that Foster’s grandfather may have suffered from paranoia, his grandmother had dementia, his aunt was paranoid, an uncle had trouble with alcohol, and another aunt committed suicide. However, they did not testify that they had seen any indications of these problems in Foster. The court also found no evidence to support the contention that Foster suffered mentally from the fact that his maternal grandfather essentially disowned his mother after she gave birth to him.
We explained in Jones v. State, 998 So.2d 573 (Fla.2008):
While we do not require a mental health evaluation for mitigation purposes in every capital ease, Arbelaez v. State, 898 So.2d 25, 34 (Fla.2005), and “Strickland does not require counsel to investigate every conceivable line of mitigating evidence ... [or] present mitigating evidence at sentencing in every case,” Wiggins [v. Smith], 539 U.S. [510], 533 [123 S.Ct. 2527, 156 L.Ed.2d 471 (2003)], “an attorney has a strict duty to conduct a reasonable investigation of a defendant’s background for possible mitigating evidence.” [State v.] Riechmann, 777 So.2d [342], 350 [(Fla.2000)]. Where available information indicates that the defendant could have mental health problems, “such an evaluation is fundamental in defending against the death penalty.’” Arbelaez, 898 So.2d at 34 (quoting Bruno v. State, 807 So.2d 55, 74 (Fla.2001) (Anstead, J., *60 concurring in part and dissenting in part)).
Jones, 998 So.2d at 583 (emphasis added); see also Taylor v. State, 87 So.3d 749, 761-62 (Fla.2012) (reiterating that when available information indicates the existence of mental health issues, an evaluation is fundamental (citing Jones, 998 So.2d at 583)). In this case, available information did not point to the existence of mental health issues. The Supreme Court in Strickland explained:
The reasonableness of counsel’s actions may be determined or substantially influenced by the defendant’s own statements or actions. Counsel’s actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information. For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel’s failure to pursue those investigations may not later be challenged as unreasonable.
Strickland, 466 U.S. at 691, 104 S.Ct. 2052 (emphasis added); see also Anderson v. State, 18 So.3d 501, 509 (Fla.2009) (rejecting claim that counsel was deficient for failing to uncover prior sexual abuse of defendant where defendant had denied such abuse prior to trial and described his childhood as normal (quoting Strickland, 466 U.S. at 691, 104 S.Ct. 2052)).
We agree that Foster did not establish that trial counsel was deficient in failing to discover the information presented at the evidentiary hearing, failing to seek further psychological testing, or failing to present this information during the penalty phase of trial. The experts presented by Foster at the hearing relied in large part on Foster’s self-reports of head trauma and depression, although neither Foster nor his mother ever reported that information to the defense team at the time of trial. Nothing in the records presented at the evidentiary hearing substantiated the claim that red flags were raised indicating Foster might have brain damage or other mental impairments. Trial counsel was never given any indication by Foster, his mother, his half-sister, or any of the other relatives or friends who testified at the penalty phase or at the postconviction evi-dentiary hearing that Foster had a difficult childhood, was witness to any abuse in the home, had a history of mental illness in the family, was suicidal, or had a history of head trauma.
The circuit court correctly determined that under the facts of this case Foster did not establish that counsel was deficient in failing to pursue further neuropsychological evaluation of Foster and in failing to present mental mitigation at trial. The circuit court concluded that trial counsel made a reasonable tactical decision, based in part on Dr. Wald’s evaluation and on other information counsel obtained at the time of trial, not to pursue further neurop-sychological evaluation. The court correctly found that the decision is not rendered deficient merely because Foster has now secured other experts who give a more favorable evaluation or diagnosis. We have noted that simply because the defendant “found a new expert who reached conclusions different from those of the expert appointed during trial does not mean that relief is warranted.” Dufour v. State, 905 So.2d 42, 59 (Fla.2005) (quoting *61 Cherry v. State, 781 So.2d 1040, 1052 (Fla.2000)). Under the facts and circumstances of this case, Foster’s counsel was not deficient in developing a mitigation strategy that sought to utilize the humanizing information about Foster as a smart, polite, helpful, normal youth who fell in with the wrong crowd and deserved to be spared the death penalty.
Even if counsel erred in failing to discover and present the same evidence presented at the evidentiary hearing, we cannot conclude that “absent the errors, the senteneer — including an appellate court, to the extent that it independently reweighs the evidence — would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.” Strickland, 466 U.S. at 695,104 S.Ct. 2052. “In assessing prejudice, ‘it is important to focus on the nature of the mental health mitigation’ now presented.” Dufour, 905 So.2d at 59 (quoting Rutherford v. State, 727 So.2d 216, 223 (Fla.1998)). The nature of the mitigation presented at the evidentiary hearing was not such that it would alter the balance of the aggravators and mitigators in any manner that undermines confidence in the result. In sentencing, the trial court found and gave great weight to the aggravating factors that the murder was committed for the purpose of avoiding or preventing a lawful arrest and that it was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification. Even if the evidence now presented by postcon-viction counsel had been available to the jury and sentencing court, we cannot conclude there is a reasonable probability that the balance of aggravating and mitigating circumstances would have been different or that counsel’s deficiencies, if any, substantially impair confidence in the outcome of the proceeding. See Lukehart v. State, 70 So.3d 503, 514 (Fla.2011).
Because nothing presented by Foster undermines our confidence in the outcome of the penalty phase proceedings, we affirm denial of relief on these claims.
D. Claim that Counsel Failed to Effectively Challenge the Avoid Arrest Aggravator[13]
Foster next contends that counsel was ineffective for failing to effectively challenge the avoid arrest aggravator.[14] The circuit court’s order found that the trial transcript refutes this claim because trial counsel did challenge the aggravators. We agree. Defense counsel argued in the charging conference that “[d]uring this penalty phase the State has not offered any evidence of any aggravators, nor did it request of the court to take judicial notice, or to instruct the jurors of anything that happened during the guilt phase.... We’re asking the Court at this time to instruct the jury that the only recommendation that they can come back with at this point in time is a recommendation of life, since the State has not presented any type of evidence.” Defense counsel also argued to the trial court that there was no evi *62 dence presented during the guilt phase to support the avoid arrest aggravator. He argued that the evidence only showed that Schwebes was going to report the incident to the school resource officer, not to law enforcement. Defense counsel further argued to the trial court that there was no evidence there was going to be an imminent arrest or anything other than a school reprimand.
Defense counsel argued to the penalty phase jury that the State failed to prove the avoid arrest aggravator because there was no evidence that avoiding arrest was the dominant factor in the murder, noting that it was Black and Torrone who were caught on the scene by Schwebes, not Foster, and that Schwebes only said he would contact the school resource officer. Moreover, Foster argued in his direct appeal that the trial court erred both in finding and submitting the avoid arrest aggravator to the jury. See Foster, 778 So.2d at 918. We rejected the claim, concluding that the evidence supported the avoid arrest aggra-vator and stating, “[T]he State established that Foster was concerned that he would ultimately be implicated should either Black or Torrone get arrested. We therefore conclude that the trial court properly submitted and relied upon this aggravator in the sentencing phase.” Id.
Because Foster’s allegations of ineffective assistance in regard to the avoid arrest aggravator are merely conelusory, are conclusively refuted by the record, and raise matters already presented on direct appeal, the postconviction court correctly denied this claim. We turn next to the postconviction claims that were summarily denied.
II. SUMMARILY DENIED CLAIMS
Standard of Review
The circuit court denied the remainder of Foster’s postconviction claims without a hearing. Because a court’s decision whether to grant an evi-dentiary hearing on a rule 8.850 motion or claim is ultimately based on written materials before the court, its ruling is tantamount to a pure question of law subject to de novo review. See State v. Coney, 845 So.2d 120, 137 (Fla.2003). Thus, this Court’s review is de novo. A postconviction court may summarily deny a defendant’s claim asserted in a rule 3.850 motion if “(1) the motion, files, and records in the case conclusively show that the movant is entitled to no relief, or (2) the motion or particular claim is legally insufficient.” Franqui v. State, 59 So.3d 82, 95 (Fla.011). Legally insufficient claims include those that are procedural!y barred in collateral proceedings because they should have been raised on direct appeal. See Johnson, 104 So.3d at 1027. In establishing a prima facie case based on a legally valid claim, “mere conelusory allegations are insufficient.” Franqui, 59 So.3d at 96; see also Doorbal v. State, 983 So.2d 464, 482 (Fla.2008).
When reviewing a circuit court’s summary denial of a rule 3.850 motion or claim, the Court must accept the movant’s factual allegations as true to the extent they are not refuted by the record. See Nordelo v. State, 93 So.3d 178, 184 (Fla.2012) (“[T]his Court must examine each claim to determine if it is legally sufficient, and if so, determine whether or not the claim is refuted by the record.” (quoting Hamilton v. State, 875 So.2d 586, 591 (Fla.2004))). We turn next to Foster’s claims alleging juror misconduct as a basis for postconviction relief.
A. Summary Denial of Claim of Juror Misconduct
1. Juror’s Denial of Prior Conviction
Foster contends in this claim that the trial court erred in summarily denying his *63 claim that the State committed a Brady violation when it failed to disclose the fact that Juror Q had been prosecuted by Lee County authorities and convicted of DUI twenty-four years earlier. See Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). During voir dire, the trial judge asked prospective Juror Q if he had ever been convicted of a crime or charged with a crime, to which he answered, “No, sir.” Juror Q did serve on the jury. Foster contends the prejudice which flowed from this nondisclosure was that Juror Q may have decided to sentence Foster to death based on the juror’s past experiences with Lee County authorities, which were unknown to counsel. Foster contends that the State had actual or constructive knowledge of this fact and failure to disclose it was a violation under Brady. He also contends that the State knowingly presented or failed to correct Juror Q’s false testimony in violation of Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).
We explained in Lebron v. State, 799 So.2d 997 (Fla.2001), that “[a] juror’s nondisclosure of information during voir dire warrants a new trial if it is established that the information is relevant and material to jury service in the ease, the juror concealed the information during questioning, and failure to disclose the information was not attributable to counsel’s lack of diligence.” Id. at 1014. See also De La Rosa v. Zequeira, 659 So.2d 239, 241 (Fla.1995) (same). More recently, we held that the movant must at least allege facts establishing a prima facie basis for prejudice. See Hampton v. State, 103 So.3d 98, 112-13 (Fla.2012), cert. denied, _ U.S. _, 133 S.Ct. 2027, 185 L.Ed.2d 892 (2013). In Hampton, we reiterated that the complaining party must establish “not only that the non-disclosed matter was ‘relevant’ ... but also that it is ‘material to jury service in the case.’” Hampton, 103 So.3d at 112 (quoting Roberts v. Tejada, 814 So.2d 334, 339 (Fla.2002) (quoting De La Rosa, 659 So.2d at 241)).
In Johnston v. State, 63 So.3d 730 (Fla.2011), we explained, “There is no per se rule that [a juror’s] involvement in any particular prior legal matter is or is not material. Factors that may be considered in evaluating materiality include the remoteness in time of a juror’s prior exposure, the character and extensiveness of the experience, and the juror’s posture in the litigation.” Id. at 738 (citations omitted) (quoting Roberts, 814 So.2d at 345). Again, in this postconviction context, the movant must establish that the undisclosed information was relevant and material to jury service. Id..[15]
The claim filed by Foster failed to allege a prima facie basis for concluding that the undisclosed twenty-four-year-old DUI conviction, even if verified, was relevant or material to Juror Q’s jury service. Just as we noted in Johnston, “nothing about the character and extensiveness of [the juror’s] own experience” in being convicted of a nonviolent offense “suggests [the juror] would be biased against a defendant pleading not guilty in a death penalty case.” Johnston, 63 So.3d at 739.
To the extent that Foster was denied a hearing on his Brady claim that the State knowingly failed to disclose this juror information resulting in prejudice, *64 the claim was correctly summarily denied. In order to establish a Brady violation, the defendant must show that (1) favorable evidence — either exculpatory or impeaching, (2) was willfully or inadvertently suppressed by the State, and (3) that because the evidence was material, the defendant was prejudiced. See Rimmer v. State, 59 So.3d 763, 785 (Fla.2010) (citing Strickler v. Greene, 527 U.S. 263, 281-82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999)). To meet the materiality prong under Brady, the defendant must “demonstrate a reasonable probability that had the suppressed evidence been disclosed the jury would have reached a different verdict,” a reasonable probability being one sufficient to undermine confidence in the outcome. Rimmer, 59 So.3d at 785. Foster has not met this test. Even assuming that the State knew or had constructive knowledge of this information and should have disclosed it, the information was not related to guilt or punishment, nor was it exculpatory or impeaching, and nothing set forth in the claim demonstrates it would have been material or favorable to Foster. See Evans v. State, 995 So.2d 933, 951 (Fla.2008) (denying Brady claim where information is neither exculpatory nor impeaching); see also Smith v. State, 931 So.2d 790, 798 (Fla.2006) (same).
To the extent Foster makes a claim under Giglio that the State knowingly allowed the presentation of false testimony on voir dire, the claim was also properly summarily denied. In order to demonstrate a Giglio violation, “a defendant must show that: (1) the prosecutor presented or failed to correct false testimony; (2) the prosecutor knew the testimony was false; and (3) the false evidence was material.” Tompkins v. State, 994 So.2d 1072, 1091 (Fla.2008) (quoting Rhodes v. State, 986 So.2d 501, 508-09 (Fla.2008)). As discussed above, Foster’s claim failed to allege facts sufficient to demonstrate that the juror’s false statement was material to his jury service and thus prejudicial. For these reasons, the circuit court’s summary denial of this claim is affirmed.
2. Consideration of Pretrial Publicity by Juror M
In this allegation of juror misconduct, Foster contends that Juror M gave an untruthful response in voir dire about her knowledge of Foster’s case gleaned from local media coverage and about her ability to be fair. He contends that despite her assurances that she could be fair, her response was untruthful because at some unknown time she mentally compared photographs she viewed at trial with those she had seen in the newspaper before being empanelled. Foster alleged that he obtained this information from the 2006 book Someone Has to Die Tonight. Foster claims that the book reveals Juror M told the author that the photographs shown in court “detailed more than what was in the paper.”
Foster’s motion conceded that when Juror M was asked on voir dire whether she had acquired any knowledge of the case from local news media, she responded that she had learned about the case from the newspaper and television. When asked if that information would affect her impartiality, she responded that she did not think so. When asked if she could set aside the information that she may have heard or seen in the paper and base her verdict solely on the evidence or the lack of evidence at trial, she said she thought she could.
To the extent that Foster is claiming the information he learned from the book is newly discovered evidence entitling him to a new trial, the postconviction court was correct in summarily denying it. *65 To obtain a new trial based on newly discovered evidence, the defendant must show that evidence was not known by the trial court, the party, or counsel at the time of trial and the defendant could not have known of it by use of due diligence. Second, the evidence “must be of such nature that it would probably produce an acquittal on retrial.” See Johnston v. State, 27 So.3d 11, 18 (Fla.2010) (quoting Jones v. State, 709 So.2d 512, 521 (Fla.1998)). Summary denial of a postconviction motion alleging newly discovered evidence will be upheld if the motion is legally insufficient or its allegations are conclusively refuted by the record. McLin v. State, 827 So.2d 948, 954 (Fla.2002). The allegations in Foster’s motion concerning Juror M are legally insufficient and summary denial of this claim was proper.
Even if it is taken as true that Juror M made the alleged comments to the author concerning the difference between the photographs in the newspaper and those at trial, there are no facts set forth that would suggest she made those same mental comparisons during trial or during her jury deliberations rather than at some point afterward when she was interviewed. Even if she mentally noted during trial that the trial photographs showed more than the photographs in the newspaper, such does not indicate that she relied on evidence outside of court or was not fair and impartial — or most importantly, that she lied during voir dire when she said she thought she could be fair. Finally, if she made those mental comparisons during deliberations, such would inhere in the verdict and her mental considerations are not subject to challenge. See Reaves v. State, 826 So.2d 932, 943 (Fla.2002). For these reasons, the trial court was correct in summarily denying this claim that Juror M lied during voir dire about her prior knowledge of the case and her ability to be fair.
Foster fails to make clear whether he is raising this claim as one of newly discovered evidence or whether he is seeking appellate review of the trial court’s denial of his motion to interview jurors. To the extent that this claim is an appeal of the trial court’s denial of a jury interview, we conclude that the circuit court’s denial of relief was proper. Foster filed a motion for juror interview pursuant to Florida Rule of Criminal Procedure 3.575 on September 28, 2010, seeking to interview Juror M on the grounds that the Greenhill book reported Juror M’s comments about the photographs. A motion for juror interview must set forth allegations that are not merely speculative or conclu-sory, or concern matters that inhere in the verdict. See State v. Monserrate-Jacobs, 89 So.3d 294, 296 (Fla. 5th DCA 2012). The posteonviction court denied the motion, finding that allegations that Juror M may have compared the evidence presented at trial with her memory of prior news accounts were speculative and eonclusory, or were subjective impressions after the jury was discharged, and that the allegations concerned matters that inhered in the verdict itself. The court therefore concluded that the allegations did not allege juror misconduct and the motion to interview was denied.
“A trial court’s decision on a motion to interview jurors is reviewed pursuant to an abuse of discretion standard.” Anderson v. State, 18 So.3d 501, 519 (Fla.2009). Florida Rule of Criminal Procedure 3.575 requires that a party must have reason to believe the verdict may be subject to legal challenge to warrant a juror interview. Juror interviews are not permitted as to matters which inhere in the verdict. See Reaves, 826 So.2d at 943. Moreover, “[i]n order to be entitled to juror interviews, [a defendant] must pres *66 ent ‘sworn allegations that, if true, would require the court to order a new trial because the alleged error was so fundamental and prejudicial as to vitiate the entire proceedings.’ ” Id. (quoting Johnson v. State, 804 So.2d 1218, 1225 (Fla.2001)).
Rule 4-3.5 of the Rules Regulating the Florida Bar also sets limits on an attorney’s ability to interview jurors. We have repeatedly held that this rule does not deny a defendant the right to effective assistance of counsel in pursuing postcon-viction relief. See Reese v. State, 14 So.3d 913, 919 (Fla.2009) (noting that the Court has held that neither rule 3.575 nor rule 4-3.5 violates a defendant’s constitutional rights); Evans v. State, 995 So.2d 933, 952 (Fla.2008) (“Without more substantial allegations of how juror Taylor’s single ‘yes or no’ response prejudiced the entire proceeding, this appears to be a ‘fishing expedition’ after a guilty verdict has been returned.”). Because the rules are valid, and because the postconviction motion and the argument on appeal present only speculative and conelusory allegations concerning Juror M which, on their face, fail to provide a reasonable basis for the court to conclude that the verdict was illegal and that a juror interview should have been granted, the postconviction court did not abuse its discretion in denying Foster’s motion to interview jurors. For all the foregoing reasons, we affirm the circuit court’s denial of this claim.
3. Jurors’ Failure to Follow Jury Instructions
The circuit court also summarily denied Foster’s claim that the jurors violated the trial judge’s instruction that they were to draw no inference of guilt from Foster’s failure to testify. Foster contends that the jury foreman was quoted in the Greenhill book as saying that Foster did not give the jury much to go on and that he “sat emotionless during the whole thing.” Citing the Greenhill book, Foster contends that the jury foreman “thought” Foster should “get up there and set the record straight” and Juror Q “thought” Foster was “like a bump on a log” without emotion. Foster also contends that other jurors, including Juror M, were adamant that Foster should show remorse and that they used lack of remorse as a nonstatuto-ry aggravator.
In the postconviction court’s order denying the juror interview, the court stated:
There does not appear to be any authority which would support Defendant’s argument that a motion to interview jurors relying solely upon information culled from news articles or a true crime novel, without the support of sworn facts or record evidence, would be cognizable. There has been no demonstration that the alleged quotes from jurors in the news articles or book were accurate recollections, were the juror’s complete statements, were unedited, or were not taken out of context.
For the same reasons set forth above, the circuit court did not abuse its discretion in denying juror interviews relative to this claim. Moreover, Foster’s claim focuses solely on the jury’s deliberations, something that we have specifically held to be impermissible. See, e.g., Vining v. State, 827 So.2d 201, 216 (Fla.2002) (“[T]his Court has cautioned ‘against permitting jury interviews to support post-conviction relief for allegations which focus upon jury deliberations.” (quoting Johnson v. State, 593 So.2d 206, 210 (Fla.1992))); Reaves, 826 So.2d at 943 (holding that matters which inhere in the verdict and the jury’s deliberations are not subject to challenge). “[A] verdict cannot be subsequently impeached by conduct which inheres in the verdict and relates to the jury’s deliberations.” Johnson, 593 So.2d at 210 (quoting *67 Mitchell v. State, 527 So.2d 179, 181 (Fla.1988)). This rule of law extends even to allegations that jurors improperly considered a defendant’s failure to testify, “a matter which essentially inheres in the verdict itself.” Reaves, 826 So.2d at 943 (quoting Sims v. State, 444 So.2d 922, 925 (Fla.1983)).
Because the allegations were legally insufficient to require an evidentiary hearing and because the circuit court did not abuse its discretion in denying the juror interview, we affirm the circuit court’s summary denial of this claim.
B. Summary Denial of Claim of Failure to Impanel an Impartial Jury
Foster next contends that defense counsel was ineffective in failing to secure a change of venue due to his deficient questioning of prospective jurors concerning their knowledge of pretrial publicity in the case. Foster notes that defense counsel filed seventeen amendments to his initial motion for change of venue. During jury selection at trial, the court denied the motions for change of venue, but conducted separate voir dire with the prospective jurors prior to the guilt phase concerning their familiarity with the news coverage and its effect on their potential jury service. Prior to the penalty phase, after Foster had been found guilty and that fact had been reported in the news, the trial court did not allow individual voir dire to determine if any jurors had seen or heard the coverage, but asked the panel as a whole if anyone had been exposed to the media coverage. No jurors indicated that they had.
On direct appeal, we affirmed the trial court’s denial of a change of venue, holding in pertinent part:
Foster provided voluminous records of various newspaper articles and television news accounts of pretrial publicity....
In contrast to the above-cited articles, most of the articles relied upon were not inflammatory. Instead, they reported on the stages and activities of the prosecution and on plea agreements entered into by the other members of the Lords of Chaos. In fact, in one of the articles, Foster’s defense counsel was quoted as saying that he had expected the plea agreements and had been preparing for them all along. Some articles focused on Schwebes’ life and his contribution to the community. Still, others focused on students’ reaction to and coping with the incident and on the state of various programs dealing with teenagers. Many others simply commented on and updated the proceedings in the case. We conclude that the media coverage as a whole did not reach such an inflammatory level to have irreversibly infected the community so as to preclude an attempt to secure an impartial jury.
Foster, 778 So.2d at 913. Foster essentially reargues the merits of the trial court’s denial of his motions for change of venue, a matter which was raised and decided on direct appeal. We have made clear that “[a]llegations of ineffective assistance cannot be used to circumvent the rule that posteonviction proceedings cannot serve as a second appeal.” Medina v. State, 573 So.2d 293, 295 (Fla.1990), quoted in Cherry v. State, 659 So.2d 1069, 1072 (Fla.1995).
Foster also claims that trial counsel was ineffective because he failed to convince the trial court to allow individual “questionnaires” of the prospective jurors. However, he does not explain how the questionnaires would have differed from the individual voir dire of the jurors that did take place. He also complains that counsel was ineffective because he could not convince the trial court to allow individual questioning of the jurors about media coverage just before the penalty phase *68 began. However, he alleges no facts to indicate that the jurors, who were under the court’s directive not to read, watch, or listen to anything about the case, were not being truthful with the court when they indicated upon the court’s inquiry prior to the penalty phase that they had not been exposed to any media reports.
As an element of this postconviction claim, Foster also argues that the rules prohibiting counsel from interviewing jurors prevented his postconviction counsel from adequately exploring possible juror biases and juror misconduct. As noted earlier, we have repeatedly held that the rules prohibiting juror interviews do not impair postconviction counsel’s ability to pursue claims. See, e.g., Evans, 995 So.2d at 952. Because Foster’s contentions of ineffective assistance of counsel are eonclu-sory and because the record refutes the allegation that proper inquiry was not made of the jurors concerning the effect of media coverage on their potential jury service, the postconviction court properly summarily denied these claims.
C. Summary Denial of Claims of Ineffective Assistance of Counsel
1. Failure to Challenge the State’s Ballistics Expert and Evidence
Foster next contends that the postconviction court erred in summarily denying his claim that trial counsel was ineffective for failing to present an expert to challenge the State’s ballistics expert, Bill Hornsby, a firearm and tool mark examiner. Foster contends trial counsel should have challenged Hornsby as to why he did not perform standard firing comparisons generally performed in the field of ballistics when he tested the shotgun.
At trial, Hornsby explained that the barrels of shotguns and those of rifles and pistols are different because shotgun barrels are “smooth bore” and do not have the grooves and imperfections, called “rifling,” which appear in the barrels of rifles and pistols and which allow testing to determine if a particular projectile traveled through a particular barrel. Hornsby testified that based on the testing he could perform, he could say that the two fired shotgun shells found at the scene had previously been chambered in and extracted from the Mossberg shotgun which he had been provided for testing. This conclusion was based on testing he performed by firing several shotgun shells from that same shotgun and, using a comparison microscope, comparing the ejector marks on both sets of shells. He also compared the striations made on the shells by the extractor, which is the device that pulls the shell from the chamber prior to ejection. Finally, he compared the stop marks on both sets of shells, which are marks made on the shell when the slide moves the shell up into the chamber to be fired. Hornsby conceded that he could not say the two shotgun shells found at the scene were “fired” from the Mossberg shotgun, only that at one time they had been chambered and ejected from that shotgun. He also conceded that he could not say whether the shotgun pellets taken from Schwebes’ body came from a 12-gauge or some other gauge shotgun shell. However, Hornsby was certain that the 12-gauge three-inch # 1 buckshot fired shotgun shells found at the scene had been cycled through the Mossberg shotgun.
Foster’s motion did not specify how his hypothetical expert would raise doubts about the testing Hornsby did. Even if defense counsel could have presented expert testimony that other tests existed which could have been performed, Foster’s allegations do not explain how those other tests would have resulted in a conclusion that the shells found at the scene were not at one time chambered in and ejected from *69 Foster’s shotgun. Finally, even if trial counsel were somehow deficient in failing to present its own ballistics expert, Foster has not explained what prejudice flows from that deficiency. As noted earlier, in order to prove prejudice under the second prong of Strickland, a defendant must show that, but for counsel’s deficiency, there is a reasonable probability that there would have been a different outcome, a reasonable probability being one sufficient to undermine confidence in that outcome. See Simmons v. State, 105 So.3d 475, 487-88 (Fla.2012). In this case, the facts set forth by Foster in his motion and in his claim on appeal fail to show that, but for trial counsel’s alleged deficient conduct in failing to present a ballistics expert, there is a reasonable probability of a different outcome such that our confidence is undermined. Thus, the circuit court correctly denied this claim.
2. Failure to Challenge Admissibility of Scientific Evidence
Foster also contends that the postconviction court erred in summarily denying his claim that trial counsel was ineffective for failing to request a Frye hearing to test the expert ballistic testimony concerning the source of the spent shotgun shell casings found at the scene. The court in Frye v. United States, 293 F. 1013, 1014 (D.C.Cir.1923), held that before scientific evidence is generally admissible, it must be based on methodology that is sufficiently established to have gained general acceptance in the particular field in which it belongs. See id. at 1014.
There is no question that “tool-mark identification in the context of ballistics has been used in the criminal context since at least 1929, and in Florida since at least 1937.” King v. State, 89 So.3d 209, 228 (Fla.2012). In King, we held that tool mark examination in ballistics has been a well-documented methodology over the last century and is not new or novel. Id. We also note that in Commonwealth v. Whitacre, 878 A.2d 96 (Pa.Super.Ct.2005), the Superior Court of Pennsylvania was presented with the issue of tool mark testimony concerning spent shotgun shells found at the scene of a crime, which were then compared with test-fired shotgun shells. In that case, a Frye hearing was held on the evidence presented by the firearm and tool mark examiner, who had determined by use of a comparison microscope that the spent shells had been discharged from a particular shotgun. Id. at 100-01. The appellate court concluded that the comparison methodology used on the shotgun shells had been in use since the 1930s, is a methodology that is accepted by the Association of Firearm and Tool Mark Examiners, and was neither new nor original. Id. at 101.
Because tool mark examination in ballistics, which was employed by the State’s expert in this case, is not a new or novel methodology, Foster’s trial counsel was not deficient in failing to demand a Frye hearing before admission of the testimony. In addition, because Foster’s claim is con-clusory and unspecific, and fails to allege any facts that support his allegation that the tool mark and firearms testimony by Hornsby was unreliable, the postconviction court did not err in summarily denying this claim.
3. Failure to Object to Non-Expert Testimony
Foster’s next claim concerns defense counsel’s alleged failure to object to the testimony of the lead forensic crime scene investigator Richard Joslin when he commented on the nature of the wounds suffered by Schwebes and on the origin of a piece of paper he found at the scene. As to Schwebes’ wounds, Joslin testified that in his experience he had seen other wounds consistent with the injuries he saw *70 on Schwebes and that in his experience those were consistent with shotgun injuries. He also testified that he found small metallic objects in the wall of Schwebes’ home that looked consistent with pellets from a shotgun cartridge. Joslin was present at the autopsy and observed the chief medical examiner remove “some small metallic items consistent with pellets from the victim’s pelvic region, and also from his head,” and Joslin took possession of the pellets at that time. Joslin also testified that he found a small disk of paper at the crime scene consistent with the inner makings of a shotgun cartridge. On cross-examination, defense counsel elicited testimony from Joslin that there was no physical evidence that connected Foster with the crime scene, and he agreed there were no fingerprints on the shotgun shell casings found at the scene.
Foster contends that if defense counsel had objected to Joslin’s testimony in which he said that, in his experience, the wounds looked consistent with other wounds he had seen in the past caused by shotgun pellets, and his testimony that the paper disk found on the scene looked consistent with wadding that comes out of shotgun shells, there is a probability that the outcome of this trial would have been different. As noted above, Foster is not required to show that counsel’s deficient conduct more likely than not altered the outcome of the proceeding, but instead must only establish a probability sufficient to undermine confidence in that outcome. See Simmons, 105 So.3d at 487. We first note that Foster’s trial counsel did object that Joslin was not qualified to testify about whether in his experience he had observed other wounds in the past that were consistent with the wounds he observed on Schwebes. However, Joslin was not testifying as a ballistics expert but only testifying from his experience as a crime scene investigator that certain things appeared consistent with his experience. Further, other testimony and evidence established beyond any doubt that the wounds were in fact shotgun pellet wounds and that spent shotgun shells that had been cycled through Foster’s shotgun were in fact found at the scene. Thus, counsel’s error, if any, does not undermine this Court’s confidence in the outcome. The postconviction court did not err in summarily denying this claim.
4. Trial Counsel’s Alleged Failure to Challenge Hearsay
The next subject of Foster’s claim that trial counsel was ineffective concerns whether trial counsel “effectively” challenged the hearsay testimony of codefen-dants Young, Shields, and Magnotti. Foster also contends that trial counsel was ineffective for failing to “properly object” to David Adkins’ testimony that Schwebes told him he intended to report Black and Torrone to the school resource officer. We find no merit in these claims.
Taking Adkins’ testimony first, Foster contends in this appeal that “[cjounsel’s failure to raise a contemporaneous objection to or effectively challenge Adkins’ hearsay testimony rendered his assistance ineffective.” However, defense counsel not only objected to the testimony during trial, he filed a pretrial motion in limine to prevent the hearsay testimony of Adkins from being presented. Thus, the trial court correctly summarily denied the claim as it pertained to Adkins’ testimony — it was conclusively refuted by the record. Moreover, the predicate for the claim— that Adkins’ hearsay testimony was inadmissible — was raised on direct appeal and the testimony was found to be inadmissible but harmless. See Foster, 778 So.2d at 916. Thus, the claim is procedurally barred.
*71 As to the hearsay testimony of Foster’s codefendants Young, Shields, and Magnotti concerning what Black said about Schwebes’ threat to report Black and Torrone to the school resource officer, the postconviction court also correctly summarily denied this claim. The claim is both procedurally barred and conclusively refuted by the record. Trial counsel did object to this hearsay testimony and on direct appeal we held:
Foster argues that the statements of Magnotti, Young, and Shields, which repeated what Black had told them regarding Schwebes’ statement to Black and Torrone about reporting them to campus authorities, constituted hearsay within hearsay and, therefore, were not admissible. We conclude that the trial court properly admitted these statements to establish both knowledge and motive, rather than to establish the factual truth of the contents of the statements. Specifically, these statements were introduced to show, first, that Foster and the rest of the group members present had knowledge of the statement made by Schwebes.
Foster, 778 So.2d at 915. Even though counsel did object and we ruled on the issue on direct appeal, Foster now contends that trial counsel was ineffective for failing to move in limine to exclude that hearsay testimony. Foster may not use the claim of ineffective assistance of counsel in an attempt to circumvent the procedural bar presented by this Court’s ruling on direct appeal. See Gore v. State, 846 So.2d 461, 466 n. 4 (Fla.2003) (“Gore cannot now attempt to resurrect these issues as ineffective assistance of counsel claims on appeal to this Court by making conelu-sory allegations of counsel’s ineffectiveness.”).
Moreover, “a defendant may not simply file a motion for postconviction relief containing conclusory allegations ... and then expect to receive an evidentiary hearing. The defendant must allege specific facts that, when considering the totality of the circumstances, are not conclusively rebutted by the record.... ” Allen v. State, 854 So.2d 1255, 1258-59 (Fla.2003) (quoting Kennedy v. State, 547 So.2d 912, 913 (Fla.1989)). Because the claim that trial counsel failed to object to this testimony is conclusively rebutted by the record and procedurally barred, the postcon-viction court correctly summarily denied this claim.
D. Brady/Giglio and Newly Discovered Evidence Claims that the Forensic Science Evidence at Trial is Invalid
Although Foster characterized this issue on appeal as both a newly discovered evidence claim and a Brady/Giglio claim, he fails to make any argument as to the forensic evidence that the State knowingly presented false testimony or evidence, or that it withheld any exculpatory or impeaching evidence. In a brief conclu-sory argument, he also contends that trial counsel was ineffective in failing to challenge the forensic evidence, based in large part on the same criticisms and concerns expressed in a 2009 report issued by the National Academy of Sciences Committee on Identifying the Needs of the Forensic Sciences Community titled Strengthening Forensic Science in the United States: A Path Forward.[16]
In order to make a newly discovered evidence claim, Foster first must allege sufficient facts showing that the evidence was unknown by the trial court, the party, or his counsel, and that his counsel *72 could not have known of it by use of due diligence. Second, if the evidence is newly discovered, it must be such that on retrial the defendant would probably be acquitted. Johnston v. State, 27 So.3d 11, 21 (Fla.2010) (citing Jones v. State, 709 So.2d 512, 521 (Fla.1998)). This Court held in Johnston that the same 2009 report cited by Foster does not meet the test for newly discovered evidence. We explained:
First, we note that the report cites to existing publications, some of which were published even before Mary Hammond’s [1988] murder. The majority of the remaining publications were published during the years when Johnston was pursuing postconviction relief. Therefore, we decline to conclude that the report is newly discovered evidence. Moreover, even if the report were newly discovered evidence, we conclude that the report lacks the specificity that would justify a conclusion that it provides a basis to find the forensic evidence admitted at trial to be infirm or faulty.... Nothing in the report renders the forensic techniques used in this case unreliable, and we note that Johnston has not identified how the article would demonstrate, in any specific way, that the testing methods or opinions in his case were deficient.
Johnston, 27 So.3d at 21-22 (bracketed material added). Similarly in this case, the report cites to existing publications, some of which were published before Schwebes’ murder and many of which were published during the years when Foster was pursuing postconviction relief. Most importantly, new research studies are not recognized as newly discovered evidence. See Schwab v. State, 969 So.2d 318, 325 (Fla.2007) (holding that “new opinions” or “new research studies” contained in journal articles are not newly discovered evidence); see also Rutherford v. State, 940 So.2d 1112, 1117 (Fla.2006) (holding American Bar Association report published in 2006 was not newly discovered evidence because it was “a compilation of previously available information related to Florida’s death penalty system”). Finally, just as we noted in Johnston, “[n]othing in the report renders the forensic techniques used in this case unreliable” and Foster “has not identified how the article would demonstrate, in any specific way, that the testing methods or opinions in his ease were deficient.” Johnston, 27 So.3d at 21-22.
As to Foster’s conclusory claim of ineffective assistance of counsel in failing to challenge all the forensic evidence, the claim was also properly summarily denied. For all these reasons, we affirm the post-conviction court’s summary denial of this claim.
E. Summary Denial of Lethal Injection Claim
Foster next contends that the postconviction court erred in summarily denying his claim that Florida’s lethal injection procedure violates the Eighth Amendment to the Constitution, although he concedes that this Court has repeatedly rejected challenges to Florida’s lethal injection protocol. Foster contends that the Department of Corrections (DOC) protocol now calling for the substitution of pento-barbital for the sodium thiopental that had previously been used in the procedure renders the lethal injection procedure unconstitutional. He bases this claim primarily on the allegation that in 2011 the Danish pharmaceutical company Lundbeck, Inc., which then held the license to produce pentobarbital in this country, sought to stop the United States from using the drug to execute prisoners.
We made clear in Pardo v. State, 108 So.3d 558 (Fla.2012), in rejecting Par-do’s constitutional challenge to the use of *73 pentobarbital, that to raise a successful Eighth Amendment challenge, the defendant must demonstrate that “the conditions presenting the risk must be ‘sure or very likely to cause serious illness or needless suffering,’ and give rise to ‘sufficiently imminent dangers.’ ” Id. at 562 (quoting Baze v. Rees, 553 U.S. 35, 49-50, 128 S.Ct. 1520, 170 L.Ed.2d 420 (2008) (quoting Helling v. McKinney, 509 U.S. 25, 34-35, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993))). We also rejected this same challenge to the use of pentobarbital in Valle v. State, 70 So.3d 530, 540-41 (Fla.), cert. denied, _ U.S. _, 132 S.Ct. 1, 180 L.Ed.2d 940 (2011), where an evidentiary hearing was held and expert testimony presented. We held in Valle that “[t]o the extent Valle asserts that the use of pento-barbital creates a risk of serious harm in light of the fact that it may be from a foreign source or lacks FDA approval for use in lethal injections, we reject these claims, as other courts have similarly done.” 70 So.3d at 541 n. 13 (citing Brewer v. Landrigan, _ U.S. _, 131 S.Ct. 445, 445, 178 L.Ed.2d 346 (2010)). We also held in Valle that the facts that Lundbeck sent letters to the DOC and the Governor stating that the use of pentobarbital in lethal injection was outside the approved label and that Lundbeck could not assure the safety and efficacy of its use in executions — and requesting that it not be used in executions — do not establish a substantial risk of serious harm. Id. at 542. Similarly, in Ferguson v. Warden, 493 Fed.Appx. 22 (11th Cir.), cert. denied, _ U.S. _, 133 S.Ct. 498, 184 L.Ed.2d 334 (2012), an unpublished opinion, the Eleventh Circuit Court of Appeals rejected a challenge to the use of pentobarbital in the lethal injection sequence. See Ferguson, 493 Fed.Appx. at 25 (citing Valle v. Singer, 655 F.3d 1223, 1225 (11th Cir.2011)).
Foster attempts to distinguish his claim from those in prior cases by contending that if granted an evidentiary hearing, he would call witnesses from Lundbeck, Inc., to testify about the properties of the drug, and that he would call witnesses to testify about how the DOC is obtaining the drug and whether that process is in compliance with state and federal regulations, given that pentobarbital is a schedule II regulated substance under section 893.03(2), Florida Statutes (2012). Foster also contends that Baze left open the question of the constitutionality of lethal injection where it is not carried out as written and that Florida’s history of deviating from execution procedures is relevant to that inquiry. This allegation relies on the conclusory and speculative assertion that Florida will not adhere to its execution procedures. However, we held in Pardo that in making such a challenge, the defendant cannot rely on conjecture or speculation. 108 So.3d at 565. Because these asserted reasons for holding an evidentiary hearing in this case are either based on conjecture and speculation or pertain only to matters that are unrelated to whether use of the drug would constitute cruel and unusual punishment, denial of relief on this claim was proper.
F. Summary Denial of Newly Discovered Evidence Claim that Foster’s Death Sentence Constitutes Cruel and Unusual Punishment
Foster’s next claim concerns the American Bar Association Death Penalty Moratorium Implementation Project and the Florida Death Penalty Assessment Team report titled Evaluating Fairness and Accuracy in the State Death Penalty Systems: The Florida Death Penalty Assessment Report, September 17, 2006. Foster contends that the conclusions in the report show that the death penalty *74 system in Florida is seriously flawed and that the problem areas identified in the report demonstrate the State’s inability to produce a rehable result in a capital case. For this reason, he urges the Court to find Florida’s death penalty violates the constitution. However, this Court has rejected identical claims based on the 2006 ABA report in a number of prior cases. See, e.g., Seibert v. State, 64 So.3d 67, 83-84 (Fla.2010) (rejecting claim based on the ABA report and reiterating that nothing in the report would cause the Court to recede from its past decisions upholding the constitutionality of the death penalty); Tompkins v. State, 994 So.2d 1072, 1082-88 (Fla.2008) (“[T]his Court has repeatedly rejected the claim that the ABA Report in question is newly discovered evidence.”); Power v. State, 992 So.2d 218, 222 (Fla.2008) (reiterating that nothing in the report would cause the Court to recede from past decisions holding the death penalty constitutional and finding that “Power has ‘not allege[d] how any of the conclusions in the report would render his individual death sentence unconstitutional.’ ” (quoting Rolling v. State, 944 So.2d 176, 181 (Fla.2006))); Rutherford v. State, 940 So.2d 1112, 1118 (Fla.2006) (“[Njothing therein would cause this Court to recede from its decisions upholding the facial constitutionality of the death penalty.”). We also held in Walton v. State, 3 So.3d 1000, 1013 (Fla.2009), that although Walton attempted to allege that the ABA report’s conclusions rendered his individual death sentence unconstitutional, the allegations related only to generalities that were noted in the report and did not relate in any specific way to the defendant’s death sentence.
For these reasons, we find that this claim is without merit and affirm the post-conviction court’s summary denial.
G. Claim that Cumulative Error Requires a New Trial
In Foster’s cumulative error claim he contends that he did not receive the fundamentally fair trial to which he was entitled under the Eighth and Fourteenth Amendments and that due process was violated by the “sheer number and types of errors involved in his trial, when considered as a whole.” As grounds for this claim, he cites only “flaws in the system that convicted Mr. Foster” which have been “pointed out throughout not only this pleading, but also in Mr. Foster’s direct appeal and his 3.850 Motion.” We explained in Troy v. State, 57 So.3d 828 (Fla.2011), that where multiple errors are discovered, even if each standing alone is considered harmless, the cumulative effect of such errors may deny the defendant a fair trial. Id. at 844 (citing McDuffie v. State, 970 So.2d 312, 328 (Fla.2007)). “However, where the allegations of individual error are procedurally barred or merit-less, a claim of cumulative error also fails.” Id. (citing Israel v. State, 985 So.2d 510, 520 (Fla.2008)); see also Delhall v. State, 95 So.3d 134, 166 (Fla.2012); Rogers v. State, 957 So.2d 538, 554 (Fla.2007); Parker v. State, 904 So.2d 370, 380 (Fla.2005); Wright v. State, 857 So.2d 861, 871 (Fla.2003); Downs v. State, 740 So.2d 506, 509 n. 5 (Fla.1999). On direct appeal, this Court did find several errors in improper admission of hearsay, which we held were harmless. However, because we find no error has been demonstrated in this appeal that can be considered cumulatively with any other errors, relief is denied on this claim.
H. Summary Denial of Claim that Death Sentence Violates the Constitutional Prohibition Against Cruel and Unusual Punishment
Foster next contends the postcon-viction court erred in denying his claim that his death sentence is unconstitutional *75 because Standard Jury Instruction (Crim.) 7.11, which instructs jurors on their role in the penalty phase of trial, failed to provide the jury with a clear understanding of its role in sentencing. Foster’s substantive challenge to the standard jury instruction in this appeal is procedurally barred. See, e.g., Stewart v. State, 37 So.3d 243, 262 (Fla.2010) (“Stewart’s substantive challenge to the [penalty phase] jury instructions is procedurally barred because it could have been raised on direct appeal.”).
Moreover, even if not barred, Foster’s claims are without merit. In Patrick v. State, 104 So.3d 1046 (Fla.2012), cert. denied, _ U.S. _, 134 S.Ct. 85, 187 L.Ed.2d 65, 2013 WL 1915248 (2013), we reiterated that the claim that the standard jury instructions impermissibly dilute the jury’s sense of responsibility is without merit. “[T]he standard penalty phase jury instructions fully advise the jury of the importance of its role, correctly state the law, do not denigrate the role of the jury, and do not violate Caldwell v. Mississippi.[ 17]” Patrick, 104 So.3d at 1064 (citation omitted) (quoting Jones v. State, 998 So.2d 573, 590 (Fla.2008)); see also McCray v. State, 71 So.3d 848, 879 (Fla.2011) (rejecting ineffective assistance of counsel claim because there was no error in giving Standard Jury Instruction 7.11 (Penalty Proceedings—Capital Cases)); Smithers v. State, 18 So.3d 460, 472 (Fla.2009) (rejecting claim that counsel was ineffective for failing to litigate the sufficiency of the jury instructions that were virtually identical to Jury Instruction 7.11). We also made clear in Chavez v. State, 12 So.3d 199, 214 (Fla.2009), that the claims Foster raises are without merit. We stated:
This Court has repeatedly rejected claims that the standard jury instructions impermissibly shift the burden to the defense to prove that death is not the appropriate sentence or that these instructions unconstitutionally denigrate the role of the jury in violation of Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). See, e.g., Taylor v. State, 937 So.2d 590, 599 (Fla.2006) (citing Elledge v. State, 911 So.2d 57, 79 (Fla.2005); Mansfield v. State, 911 So.2d 1160, 1180 (Fla.2005); Sweet v. Moore, 822 So.2d 1269, 1274 (Fla.2002)); Carroll v. State, 815 So.2d 601, 622-23 (Fla.2002); Rutherford v. Moore, 774 So.2d 637, 644 & n. 8 (Fla.2000); Downs v. State, 740 So.2d 506, 517 n. 5 (Fla.1999); San Martin v. State, 705 So.2d 1337, 1350 (Fla.1997); Shellito v. State, 701 So.2d 837, 842 (Fla.1997); Sochor v. State, 619 So.2d 285, 291 (Fla.1993); Turner v. Dugger, 614 So.2d 1075, 1079 (Fla.1992); Combs v. State, 525 So.2d 853, 855-58 (Fla.1988).
Chavez, 12 So.3d at 214.
Foster also argued in the postconviction proceeding below that counsel was ineffective for failing to request the trial court to advise the jury that its recommendation would carry great weight and only be overridden in circumstances where no reasonable person could disagree. However, the record reflects that trial counsel did request the court to instruct the jury that it is a co-sentencer with the court and that the court must give the jury’s recommendation great weight. Foster’s trial counsel also specifically requested and was denied *76 various other special jury instructions concerning the jury’s role in recommending a sentence and the weight that would be given the jury’s recommendation.[18] Therefore, counsel was not deficient in failing to request additional special instructions on the jury’s role in sentencing. Because Foster’s claims concerning the penalty phase jury instructions are procedurally barred, without merit, and conclusively refuted by the record, we affirm the court’s summary denial of relief.
I. Summary Denial of Claim that the Burden of Proof was Shifted to Foster in the Penalty Phase
Finally, in a related claim, Foster contends that the trial court erred in summarily denying his claim that the trial court impermissibly shifted the burden to Foster to prove that the mitigators outweighed the aggravators by the instructions given concerning aggravating and mitigating factors. The instruction about which Foster complains is the trial court’s instruction at the penalty phase advising the jury that it must decide whether sufficient aggravating circumstances exist that would justify imposition of the death penalty and whether there are mitigating circumstances sufficient to outweigh the aggravating circumstances.
To the extent that Foster is attempting to make a substantive challenge that the instructions shifted the burden, separate and apart from any claim of ineffective counsel, that claim is barred in postconviction proceedings. See Stewart, 37 So.3d at 262 (“Stewart’s substantive challenge to the jury instructions is procedurally barred because it could have been raised on direct appeal.”).[19] As noted above, we held in Chavez that the claim of burden shifting that Foster raises here is without merit. See Chavez, 12 So.3d at 214; see also Serrano v. State, 64 So.3d 93, 115 (Fla.2011) (“This Court has also rejected the claim that the jury instructions unconstitutionally shift the burden of proof.”); Schoenwetter v. State, 931 So.2d 857, 876 (Fla.2006) (“This Court and the United States Supreme Court have repeatedly found that the standard jury instructions, when taken as a whole, do not shift the burden of proof to the defendant.”). For these reasons, the postconviction court correctly denied this claim.
CONCLUSION
For the foregoing reasons, we affirm the denial of Foster’s rule 3.850 motion for postconviction relief.
It is so ordered.
*77 POLSTON, C.J., and PARIENTE, LEWIS, QUINCE, CANADY, LABARGA, and PERRY, JJ., concur.

. The aggravating factors were (1) the capital felony was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody; and (2) the capital felony was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification.

. The trial court expressly rejected a number of proffered mitigators. The court did not reject the mitigators that Foster was helpful to neighbors, was a nice young man, was a good worker, was polite, and had good character, according to over twenty witnesses. The trial court did not state what, if any, weight was given to these mitigators. Other mitigators not rejected but expressly given little to no weight were that he was a premature baby and was abandoned by his father at one month of age, and that he will adjust well to prison. The trial court expressly rejected Foster’s age of eighteen as a statutory miti-gator.

. Spencer v. State, 615 So.2d 688 (Fla.1993) (allowing for a hearing before only the judge at which additional evidence may be presented before sentencing).

. Foster’s motion was filed under rule 3.850 because the current version of the postconviction rule for capital cases, Florida Rule of Criminal Procedure 3.851, applies to postcon-viction motions filed on or after October 1, 2001. See Franqui v. State, 59 So.3d 82, 95 n. 13 (Fla.2011); Fla. R.Crim. P. 3.851(a).

. In his amended motion, Foster raised the following postconviction claims: (1) Foster was deprived of his right to a fair and impartial jury due to juror misconduct and ineffective assistance of counsel during voir dire; (2) Foster is being denied his constitutional rights in that rules prohibiting his lawyers from interviewing jurors to determine if constitutional error was present are unconstitutional under the unique circumstances of this case; (3) Foster was denied effective assistance of counsel at the penalty phase in that trial counsel failed to investigate and prepare mitigating evidence and failed to adequately challenge the State's aggravating circumstances such that no adversarial testing could occur; (4) counsel rendered deficient performance in failing to effectively object to the avoid arrest aggravating circumstance at penalty phase; (5) Foster was denied effective assistance of counsel pretrial and at the guilt phase of his capital trial; (6) newly discovered evidence shows that the forensic science used to convict Foster was neither reliable nor valid, thus depriving him of his constitutional rights; (7) the existing procedure that the State of Florida utilizes for lethal injection constitutes cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution; (8) newly discovered empirical evidence demonstrates that Foster’s conviction and sentence of death constitutes cruel and unusual punishment; (9) Foster's trial was fraught with procedural and substantive errors which cannot be harmless when viewed cumulatively; (10) Foster’s death sentence constitutes cruel and unusual punishment in violation of the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution; and (11) Foster’s death sentence violates the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution because the law and jury instructions shifted the burden to Foster to prove that death was inappropriate.

. Huff v. State, 622 So.2d 982, 983 (Fla.1993) (holding that in all capital cases the judge must allow the attorneys an opportunity to be heard on an initial postconviction motion for the purpose of determining whether an evi-dentiary hearing is required and to hear legal argument relating to the motion).

. Wootton testified that his main responsibility was to organize all the trial documents and computerize them into a trial program called “Trial Scout,” which ultimately contained thousands of pages of documents.

. Because Foster’s lead defense counsel at trial, Robert Jacobs, died in 2007, his testimony about what mitigation was investigated and how strategic decisions were made concerning the penalty phase was unavailable.

. Kelly Foster's biological father was Ronald Newberry, Ruby Foster’s first husband.

. Jim Greenhill, Someone Has to Die Tonight (2006).

. Foster contends that Wootton's testimony was not competent because evidence supplemented into the record after the hearing — a letter written by Wootton — showed that he had a sexual relationship with Foster’s mother, Ruby Foster, and told her in the letter that "counsel fucked up." Regardless of the fact that Wootton may have had a relationship with Ruby Foster during the trial and may not have been truthful about that fact when he testified at the hearing, the circuit court cor *56 rectly found that the totality of the evidence supported the conclusion that the defense team was not confused, disorganized, or impaired.

. The brain map which is the subject of Dr. Gur’s testimony, based on statistical data and data derived from psychological testing, is to be distinguished from structural or functional brain imaging from an MRI, fMRI, or PET scan of an individual’s brain.

. Section 921.141(5)(e), Florida Statutes (Supp.1996), sets forth the "avoid arrest” ag-gravator as follows: "The capital felony was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody.”

. In his postconviction claim below, Foster contended that trial counsel was ineffective in failing to adequately challenge the aggravating factors. On appeal, Foster contends that the trial court improperly applied the aggravating factor of "avoid arrest” and that the postconviction court denied Foster a hearing on this claim. The circuit court's order granting an evidentiary hearing did include the claim that trial counsel inadequately challenged the aggravating factors. The court noted in its final order that Foster presented no evidence to demonstrate how trial counsel was inadequate.

. The postconviction court denied Foster's separate motion to interview Juror Q, finding that "[t]he alleged fact that Mr. [Q] was a defendant in a misdemeanor DUI case would not be material to his service as a juror in a murder trial_Mr. [Q's] prior criminal case is also not material because it is too remote in time as, according to Defendant, it was 24 years prior to the juror’s service.”

. See Nat'l Research Council, Strengthening Forensic Science in the United States: A Path Forward (2009), available at https://www. ncjrs.gov/pdffiles l/nij/grants/22 8091 .pdf.

. In Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), the Supreme Court held that it is "constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant’s death rests elsewhere.” Id. at 328-29, 105 S.Ct. 2633.

. Foster's trial counsel requested the following special instructions: that in order to recommend death, the juror must find that the aggravating circumstances outweigh the mitigating circumstances beyond all doubt; that although the jury’s recommendation is considered to be advisory, the jury’s recommendation of death is entitled to great weight; that if the juror finds that aggravating circumstances exist, the juror must determine whether the aggravating circumstances outweigh the mitigating circumstances beyond and to the exclusion of every reasonable doubt in deciding whether the sentence should be life or death; that mitigating circumstances need only be proven by the fair weight of the evidence; that any one mitigating factor standing alone may support the conclusion that death is not the appropriate penalty; and that to impose death, the juror must be convinced beyond a reasonable doubt that the totality of the aggravating circumstances outweighs the totality of the mitigating circumstances.

. Foster's brief does not allege ineffective assistance of counsel in this claim, but had he done so it would lack merit. Our precedent is clear that counsel cannot be deemed ineffective for failing to raise a meritless claim. See, e.g., Troy v. State, 57 So.3d 828, 843 (Fla.2011).